## Part 1. LEASE SUMMARY SCHEDULE

| | |
|---|---|
| **Lease Execution Date:** | March 1, 2021.  This Lease is effective upon the Lease Execution Date. |
| **Tenant:** | **TALLULAH'S TAQUERIA, LLC**, a Rhode Island limited liability company |
| **Tenant's Notice Address:** | 146 Ives Street<br>Providence, RI 02906<br>Attn: Kelly Ann Rojas<br>Telephone Number: (323) 974-2835<br>E-mail Address: kellyann@tallulahstaqueria.com |
| **Landlord:** | **FARM FRESH RHODE ISLAND**, a Rhode Island nonprofit corporation |
| **Landlord's Notice Address:** | 10 Sims Avenue<br>Providence, Rhode Island 02909<br>Attn: Lucie Searle<br>Telephone Number: (401) 345-0616<br>E-mail Address: Lucie@farmfreshri.com |
| **Building:** | The building located at 10 Sims Avenue, Providence Rhode Island, 02909. The Building is located on the parcel of land ("Land") described on Exhibit A. |
| **Premises:** | The Premises are designated as Suite #109 as shown on the "Suite Layout Plan" attached hereto as Exhibit B. The Premises contain approximately 5,105 ± net usable square feet ("NSF") of space (measured from interior wall to interior wall). Where applicable in this Lease, Tenant's Pro Rata Share is 9.15%; calculated based upon a fraction, the numerator of which is the NSF of the Premises and the denominator of which is  the gross square footage of the floor area of the Building (61,759 gross square feet, measured from exterior wall to exterior wall) multiplied by 100; provided, however, that Service/Utility and Circulation areas are excluded from the denominator. |
| **Food Hub Property:** | A portion of the Building will house all of Landlord's programs and operations, including a farmers' market and the remainder of the Building will be leased to businesses, all of which together with the Land and all improvements thereon from time to time, including the Building, will comprise the "Farm Fresh Food Hub," hereinafter sometimes referred to as the "Food Hub" or the "Property". |
| **Term Commencement Date:** | March 1, 2021 |
| **Landlord's Work:** | See Exhibit C; Landlord is delivering the Premises on the Lease Execution Date with the Landlord's Work having been Substantially Completed (as defined in Section 8.1 of this Lease). Tenant is responsible for all *italicized* items set forth in Exhibit C. except where such items are to be provided by Landlord pursuant to Exhibit C or Exhibit D, and except where such items comprise Tenant Fixturing. |
| **Tenant Improvements:** | See Exhibit D; Tenant and Landlord agree that Landlord will contract with Landlord's contractor to cause to be performed the Tenant Improvements, subject to and in accordance with Article 9 of this Lease and all approved Tenant Plans, as |

1

| | |
|---|---|
| | defined in Section 9.1. The Tenant Improvements shall be at Tenant's sole cost and expense; provided, however, that Landlord shall provide Tenant with the Tenant Allowance. |
| **Rent Commencement Date:** | July 1, 2021 |
| **Term:**<br><br>**Termination Date:** | March 1, 2021 to February 28, 2031<br><br><br>11:59pm (Eastern Time) on February 28, 2031 |
| **Option to Extend:** | Tenant shall have the option to extend the Term for two (2) additional terms of five (5) years each (hereinafter referred to as the "Extended Term") as provided in Section 3 hereof. |
| **Lease Year:** | The first "Lease Year" shall be the period commencing on the Term Commencement Date and ending on February 28, 2022, and each succeeding consecutive twelve (12) month period thereafter shall be a Lease Year, with the final Lease Year ending on the Termination Date. |
| **Permitted Uses of Premises:** | Tenant shall be permitted to use the Premises for the operation of a Mexican restaurant, offering take-out and dine-in. Premises may also be used as a commissary, providing food preparation for other food establishments owned and operated by Tenant and its affiliates. Further, the Premises may be used for the production and distribution of tortillas, salsas, and related retail food products. Additionally, the Premises may also include (but not primarily used for) a bar serving alcoholic beverages for on premises consumption and to-go, subject to and in accordance with Providence and Rhode Island COVID-19 rules and regulations; and no other uses, including without limitation, the Prohibited Uses set forth herein. |
| **Security Deposit:** | Tenant shall pay a Security Deposit of Six Thousand and Three Hundred and Eighty-one Dollars ($6,381.00) in two equal installments of Three Thousand One Hundred Ninety and 50/100 Dollars ($3,190.50) each on September 1, 2021 and on October 1, 2021, which amount is equal to one (1) month of full Base Rent (Month 7 of Lease Year 1),, which Security Deposit shall be held, replenished or released in accordance with Section 4 hereof. |
| **Base Rent:** | Base Rent shall commence on the Rent Commencement Date and shall be payable in accordance with the Base Rent Schedule on the following page and Article 5. |
| **Additional Rent:** | Additional Rent shall be payable in accordance with Article 6 hereof. |
| **Promotion Fee:** | Landlord reserves the right to assess a "Promotion Fee" in accordance with Section 6.2(e). |

| **BASE RENT SCHEDULE**<br>**Period** | **Per Square Foot** | **Monthly Base Rent** | **Annual Base Rent** |
|---|---|---|---|
| Lease Year 1<br><br><br>Monthly Breakdown: | $7.50 | $6,381.00<br>(at full operation) | $38,286.00 |

| | | | |
|---|---|---|---|
| −March 1 – June 30, 2021 (Free Rent) | | $0 | |
| −July 1 – February 28 | | $6,381.00 | |
| Lease Year 2 | $16.00 | $6,807.00 | $81,658.00 |
| Lease Year 3 | $17.00 | $7,232.00 | $86,785.00 |
| Lease Year 4 | $17.00 | $7,232.00 | $86,785.00 |
| Lease Year 5 | $18.00 | $7,658.00 | $91,890.00 |
| Lease Year 6 | $18.72 | $7,964.00 | $95,566.00 |
| Lease Year 7 | $19.28 | $8,203.00 | $98,424.00 |
| Lease Year 8 | $19.86 | $8,449.00 | $101,386.00 |
| Lease Year 9 | $20.46 | $8,704.00 | $104,448.00 |
| Lease Year 10 | $21.07 | $8,963.00 | $107,562.00 |

Extended Term:

If applicable, Annual Base Rent shall be calculated in accordance with Sections 5.2 and 5.3.

**Lease Exhibits:**

| | | |
|---|---|---|
| Part 1 | Lease Summary Schedule and Base Rent Schedule |
| A | Legal Description of Land |
| B | Suite Layout Plan |
| C | Landlord's Work |
| D | Tenant Improvements |
| E | New Markets Tax Credit Disclosure and Acknowledgment |
| F | Community Benefits Rider |
| G | Employee Verification Form |
| H | Lease Guaranty |

[Part 2 of Lease Continued on Following Pages.]

## Part 2.    LEASE AGREEMENT

THIS LEASE is made and entered into as of the Lease Execution Date as stated in <u>Lease Summary Schedule</u> by and between Landlord and Tenant named in the Lease Summary Schedule.

### REFERENCE DATA

Each reference in this Lease to any of the terms and titles contained in the Lease Summary Schedule and any Exhibit attached to this Lease shall be deemed and construed to incorporate the data stated under that term or title in such Lease Summary Schedule or Exhibit, each of which is attached hereto and incorporated herein by reference.

1.    <u>Premises</u>.

1.1    Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord, the Premises as described in the Lease Summary Schedule, upon and subject to the terms and conditions of this Lease for the Term (and any Extended Term, if applicable) set forth herein. Landlord hereby grants to Tenant the non-exclusive right to use the common areas of the Food Hub which are designated by Landlord from time to time for the general use and convenience of Landlord and/or tenants in the Building and each of their respective agents, employees, invitees and customers (the "<u>Common Areas</u>"). By way of example and not in limitation of the foregoing, Common Areas include common restroom facilities, loading docks, service corridors, driveways, walkways and sidewalks, landscaped areas and patios, and parking areas so designated, and the areas marked "Gathering Space" and "Market Areas" as more particularly shown on <u>Exhibit B</u>, Suite Layout Plan.

1.2    Notwithstanding the foregoing, Landlord reserves the right upon not less than ten (10) days' prior written notice to Tenant, at any time following the second Lease Year, to charge Tenant a vendor fee to be reasonably determined by Landlord for the use by Tenant of vendor space at tables located in the Market Areas during those hours when the Building is open for Landlord's weekly farmers market, which vendor fee shall be the same amount charged to the other co-locators ("<u>Venue Fees</u>"). Such Venue Fees shall be due and payable according to the Farm Fresh vendor fee schedule as determined from time to time by Farm Fresh.

1.3    Additionally, notwithstanding anything to the contrary contained in this Lease, Landlord hereby reserves the right, for itself and its agents, employees, invitees and customers (the "<u>Landlord Parties</u>") and for any tenants or licensees of the Food Hub and their agents, employees, invitees and customers (the "<u>Food Hub Parties</u>") to grant priority non-exclusive and/or priority exclusive access, at various times and from time to time, to any Landlord Parties and/or any Food Hub Parties, to any or all of the Common Areas of the Food Hub ("<u>Special Access Rights</u>"). Special Access Rights may be granted or denied, in Landlord's sole and absolute discretion, upon Tenant's written request therefor. Additionally, Special Access Rights may be provided to those tenants whose premises are in close proximity to exterior Common Area patios. In particular, Landlord hereby grants Tenant Special Access Rights in the form of an exclusive license to utilize during Tenant's business hours the approximately 783 square foot exterior patio area (the "<u>Patio License Area</u>") immediately adjacent to the Premises, as more particularly shown on <u>Exhibit B</u>, which use shall at all times comply with the Rules and Regulations ("<u>Tenant's Patio License</u>"). At all times during which Tenant is permitted to use the Patio License Area Tenant shall be responsible to keep such Patio License Area and outdoor furnishings free from snow, ice, dirt, trash and debris (and in full compliance with Rhode Island Department of Health laws and regulations) and Tenant shall have the same obligations with respect to the use and occupancy of the Patio License Area as it has with respect to the Premises; provided, however, that the license granted to Tenant under this Lease is personal to Tenant and under no circumstances shall such license be subject to assignment or sub-licensing without Landlord's prior written consent.  By not later than sixty (60) days before Tenant's storefront opening, Tenant shall

submit to Landlord for Landlord's reasonable approval plans and specifications for the furnishings and layout of the Patio License Area, including the provision therein for not less than a three (3) foot wide pathway reasonably designated by Landlord to allow for the passage of persons between the Patio License Area and other exterior areas of the Food Hub (the "Patio Area Plans"). Notwithstanding anything to the contrary in this paragraph, Tenant's Patio License shall be subject to the Rules and Regulations, hereinafter defined, and Landlord's right, upon not less than twenty-one (21) days' prior written notice to Tenant ("Landlord's Patio Use Notice"), to use or allow the use of the Patio License Area for up to four (4) days (each up to a twenty-four hour period) during each calendar year for public or special events. Landlord's Patio Use Notice shall specify whether or not any of Tenant's furnishings or equipment must be removed from the Patio License Area or relocated within the Patio License Area for Landlord's usage. Tenant shall deliver the Patio License Area in "broom clean" condition and in compliance with Landlord's Patio Use Notice. Once Landlord has completed its use thereof, Landlord shall restore the Patio License Area to substantially the same condition as it was delivered by Tenant to Landlord.

       1.4.    All the perimeter walls of the Premises, except the inner surfaces thereof, any balconies, patios, walkways, terraces or roofs adjacent to the Premises, and any space in or adjacent to the Premises used for shafts, stacks, pipes, conduits, wires and appurtenant fixtures, fan rooms, ducts, electric or other utilities, sinks or other Building facilities, and the use thereof, as well as the right of access through the Premises for the purposes of operation, decoration and repair, are expressly reserved to Landlord. Landlord reserves the right to make additions to the Building and to erect additional buildings and structures on the Land. Except for the Patio License Area, Landlord reserves the right to alter, reduce, increase, relocate and change, from time to time, entrances, sidewalks, patios, landscaped areas, stairwells, lobbies and all other common facilities within the Building and driveways, parking areas and walkways on, in, under or otherwise serving the Land.

2.    Term.  The term (the "Term") of this Lease shall commence on the Term Commencement Date and end on the Termination Date, each as stated in the Lease Summary Schedule, subject to earlier termination upon default or pursuant to other provision of this Lease or pursuant to law (which date for the termination of the Term will hereafter be called "Termination Date"). If this Lease is terminated before the Term expires, then upon Landlord's request the parties shall execute an instrument acknowledging such fact and the date of termination of this Lease.

3.    Extension of Term of Lease.   So long as Tenant is not in default under this Lease at the time it elects to extend the Term or at the commencement of the Extended Term, Tenant shall have the Option to Extend the Term as set forth in the Lease Summary Schedule provided that Tenant shall have given written notice to Landlord at least six (6) months prior to the expiration of the Term, or first Extended Term (if applicable). Except for the payment of Base Rent as set forth in Section 5 hereof, such Extended Terms shall be upon the same terms, covenants and conditions as set forth herein for the initial Term. Notwithstanding anything contained herein to the contrary, (i) if a default occurs at any time after the exercise of the Option to Extend and remains uncured on either the date notice is given exercising the Option to Extend or the first day of the Extended Term, or (ii) if any other default occurs which remains uncured beyond applicable notice and cure periods on the first day of the Extended Term, Landlord may elect, by written notice to Tenant, to reject Tenant's exercise of the Option to Extend. If Landlord so rejects Tenant's exercise of the Option to Extend, the Option to Extend shall be null and void.

4.    Security Deposit.    Upon the execution of this Lease, Tenant shall pay to Landlord the Security Deposit which shall be held by Landlord without liability for interest as a security for Tenant's payment and performance hereunder. If at any time during the Term, any sum payable by Tenant to Landlord hereunder shall be overdue and unpaid, or if Tenant breaches any of Tenant's obligations under this Lease, Landlord may, but shall not be required, at its sole discretion, appropriate and apply any portion of the Security Deposit to the payment of any such sum or to compensate Landlord for loss or damage sustained or suffered by Landlord due to such breach on the part of Tenant. Tenant shall, upon the written

demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore the Security Deposit to the original sum, and Tenant's failure to do so within ten (10) days after receipt of such demand shall constitute an event of default hereunder. Should Tenant comply with all of such terms, covenants and conditions and promptly pay all sums payable by Tenant to Landlord hereunder, the Security Deposit shall be returned in full to Tenant within thirty (30) days following the termination of this Lease, minus any portion thereof which may have been utilized by Landlord to cure any default or applied to any damage suffered by Landlord.

5.    Base Rent.

5.1    During the Term, Tenant shall pay annual Base Rent to Landlord in the amounts set forth in the Lease Summary Schedule. Base Rent shall be payable in advance and without demand, on the first (1st) day of each month, during and until the expiration of the Term (and any Extended Term) by check, wire or ACH transfer in immediately available local funds made payable to Landlord and delivered to Landlord at Landlord's Notice Address set forth in the Lease Summary Schedule. Base Rent shall be prorated for any period of less than a full calendar month. Base Rent shall be payable beginning on the Rent Commencement Date.

5.2    The Base Rent for the first Lease Year of each Extended Term shall be equal to the greater of (i) the Base Rent payable under this Lease for the final Lease Year of the initial Term or the immediately preceding Extended Term, as the case may be, or (ii) the Prevailing Market Rate (as hereinafter defined) for the Premises. The Base Rent for the second and subsequent Lease Years in each Extended Term shall be equal to the product of the Base Rent for the immediately preceding Lease Year multiplied by a percentage increase as reasonably determined by Landlord based on then Prevailing Market Rate; provided, however, that such percentage increase for any Lease Year shall not exceed one hundred and five percent (105%) of the Base Rent for the immediately preceding Lease Year. Notwithstanding the foregoing, in no event shall Base Rent for any Lease Year during an Extended Term be less than Base Rent for any preceding Lease Year.

5.3    As used herein, the term "Prevailing Market Rate" for the Premises shall mean the base rent that Landlord would be able to obtain from a third party desiring to lease the Premises for the Extended Term in question, taking into account the age of the Building, the size and location of the Premises, the quality of construction of the Building and the Premises, the services provided under the terms of this Lease, the rent rates then being obtained for new leases of space comparable to the Premises in the locality of the Building (e.g., by way of reference as of the date of this Lease, commercial and retail space located in the greater Woonasquatucket and Valley neighborhoods of Providence, RI), and all other factors that would be relevant to a third party desiring to lease the Premises for an Extended Term in determining the base rent such party would be willing to pay therefor. Prevailing Market Rate shall be determined based on new rentals for similar space without standard tenant improvement allowances (as Tenant shall not receive any tenant improvement allowance for the Extended Term), but not with standard leasing commissions because Landlord shall not be obligated to provide a leasing commission with the Option to Extend. No later than one hundred eighty (180) days prior to commencement of the Extended Term, Landlord shall notify Tenant of Landlord's determination of the Prevailing Market Rate to be used to calculate the Base Rent for the Extended Term. If Tenant does not agree with Landlord's determination, the parties shall negotiate in good faith for up to thirty (30) days to agree upon the Prevailing Market Rate. If the parties do not reach agreement by the one hundred twentieth (120th) day prior to commencement of the Extended Term, the Option to Extend shall be deemed waived and of no further force or effect.

6.    Operating Expenses; Components of Base Rent and Additional Rent.

6.1    Certain Operating Expenses Included in Base Rent.

(a)     The parties acknowledge that, except to the extent specifically otherwise provided in this Lease, Tenant's share of the Base Operating Expenses (defined below) is already included within the monthly Base Rent and Tenant shall not be required to pay its share of the Base Operating Expenses as Additional Rent.

(b)     As used herein, "Base Operating Expenses" means the total costs and expenses paid or incurred by Landlord in connection with the following:

(i)     all real estate taxes which become payable during the Term (and any Extended Term) with respect to the Land, Building and all other improvements located on the Land and owned by Landlord which may be added thereto or constructed by or at the direction of Landlord within the Food Hub;

(ii)     all insurance carried by Landlord for the Food Hub (including fire, extended coverage, boiler, sprinkler, liability, rent loss, special perils and other insurance, in limits and amounts as provided in this Lease);

(iii)     Gas service associated with the Building's main boilers and Common Elements;

(iv)     Electrical service associated with the Building's main cooling tower and other Building-wide mechanical systems as well as the Building's Common Elements (e.g. market halls, bathrooms, gathering areas, common area lights, ceiling fans, exterior and parking lot lights);

(v)     Water and sewer services associated with all of the Building's Common Elements;

(vi)     Internet service associated with all Common Areas; and

(vii)     the cost of routine maintenance, repair, and cleaning of the Common Areas (including snowplowing, landscape maintenance, parking lot maintenance).

(c)     Notwithstanding the provisions of Section 6.1, Landlord reserves the right to charge Tenant Excess Usage Charges, defined in Section 6.2(a), which are not included in Base Operating Expenses. Further, Tenant shall pay to the appropriate agency any sales, excise and other tax (not including, however, Landlord's income taxes) levied, imposed or assessed by the State of Rhode Island or any political subdivision thereof or other taxing authority upon any Rent payable hereunder. Tenant shall also pay, prior to the time the same shall become delinquent or payable with penalty, all taxes imposed on its inventory, furniture, trade fixtures, apparatus, equipment, leasehold improvements installed by Tenant or by Landlord on behalf of Tenant and any other property of Tenant.

6.2     Expenses Comprising Additional Rent.

(a)     Excess Usage. The parties acknowledge that the Tenant's use of the Premises and the Patio License Area and its hours of operation may result in excess usage of the Food Hub facilities and services. Notwithstanding the provisions of Section 6.1 hereinabove, in addition to Base Rent, Landlord reserves the right to charge Tenant for any extraordinary usage by Tenant or Tenant's usage outside of the majority of the tenants of the Food Hub's normal business hours of any services which are normally included in the Base Rent, including, by way of example and not in limitation, usage of bathroom facilities (and associated water, sewer and janitorial and management, security if deemed advisable, in Landlord's reasonable judgement, and related expenses incurred by Landlord) ("Excess Usage Charges"). The parties further acknowledge that an operating history that identifies facility costs and service charges is needed in order to confirm excess usage and determine a fair apportionment of costs. Landlord shall perform an annual audit of services used by all tenants in the Building normally included in the Base Rent (including Tenant).

8

Towards that end, the parties agree, upon written notice from Landlord to Tenant, to meet no sooner than September 1, 2021 but no later February 28, 2022 and thereafter by not later than May 1 of each subsequent Lease Year during the Term and any Extended Term, to review the Food Hub's operating cost and expense history related to services described herein and Landlord's determination, reasonably exercised, of whether to allocate any portion of Excess Usage Charges to Tenant as Additional Rent and if so, the formula and elements upon which any allocation is made to Tenant. Landlord's determination shall be set forth in writing in reasonable detail and shall be accompanied by receipts or other customary evidence of such costs and expenses.

(b)     Payment Directly to Certain Utility Providers. Tenant shall be responsible for directly contracting for and paying, at its sole cost and expense, all charges (including any deposits) for gas, electricity, telephone, and internet service (singly, a "Utility" or in the plural, "Utilities"), furnished to the Premises and the Patio License Area to the extent that such Utilities shall be separately metered and/or directly billed to Tenant by the respective Utility providers. As of the Term Commencement Date, natural gas (if applicable) and electricity (i.e., "lights and plugs"), to the Premises will be separately metered.

(c)     Reimbursement to Landlord. With respect to Utilities which are not separately metered, such as water, Landlord reserves the right to have separately metered or "check metered", or to employ any alternative approach to reasonably estimate the amount of such Utilities used or consumed at the Premises and to bill Tenant monthly in arrears based upon rates charged by the providers of such Utilities. In this regard, water serving Tenant's Premises has been fitted with a check-meter and will serve as the basis for Landlord's computation of Tenant's share of water and sewer charges for water and sewer used or consumed at the Premises. Tenant shall pay Landlord, as Additional Rent, all charges billed by Landlord for such Utility services within thirty (30) days of Tenant's receipt of a billing from Landlord. Landlord may reasonably re-adjust such charges from time to time upon written notice to Tenant.

(d)     Trash, Compost and Recyclables. Landlord will contract with one or more providers of trash collection, including recyclable trash collection and cardboard and the receptacles therefor, for the Food Hub (including the Premises) ("Trash Services"). Landlord shall be responsible for managing the Trash Services, ensuring there are properly sized trash and recycling receptacles, ensuring there are enough trash and recycling receptacles for all tenants in the Building, and ensuring trash and recycling are picked up frequently enough so Tenant can dispose of its trash and recycling every evening. Trash generated from the Premises and the Patio License Area shall be placed in the appropriate receptacles designated by Landlord. The cost of Trash Services shall be reimbursed to Landlord and payable as Additional Rent by Tenant within thirty (30) days of receipt of a billing therefor from Landlord. Landlord shall determine the costs of Trash Services allocable to the Premises based upon Tenant's Pro Rata Share (or, if Tenant's Pro Rata does not reasonably reflect Tenant's actual use of the Trash Services compared to other tenants in the Building, Landlord may employ any alternative approach to reasonably estimate the amount of such Trash Services allocable to the Premises). Notwithstanding anything to the contrary contained herein, during the first Lease Years (i.e., July 1, 2021 to June 30, 2023), Tenant shall not pay more than $1,000 per month (or $12,000 per year) to Landlord as Additional Rent for Trash Services. Commencing from and after December 31, 2021, by not later than every May 1 year during the Term, and any Extended Term, Landlord shall perform an audit of Trash Services used by all tenants in the Building (including Tenant) and, based on the results thereof, Landlord shall reasonably determine (subject to Tenant's reasonable approval, which shall not be unreasonably conditioned, withheld or delayed) the Trash Services expense to be allocated to Tenant as Additional Rent as a result thereof. Landlord's determination shall be set forth in writing in reasonable detail and shall be accompanied by receipts or other customary evidence of such costs and expenses. Tenant shall be responsible for directly contracting with and paying for, at its sole cost and expense, one or more providers of compost and oil recycling services and the receptacles therefor for the Premises that are reasonably satisfactory to Landlord with Landlord providing sufficient space for the relevant receptacles.

(e)    Promotional and Amenities Fund Contribution. Landlord reserves the right to establish a fund (the "Promotion Fund") for the fees, costs and expenses associated with the provision of various amenities intended by Landlord to promote all businesses operating at the Food Hub and to enhance the visitor experience of the general public at the Food Hub, to promote the Food Hub or any events sponsored therein targeted at the general public that are intended to benefit (directly or indirectly) all co-locators and/or to provide additional amenities to the Food Hub, such as by way of example but not limitation, seasonal or special event decorations or signage (including without limitation stanchions or banners or electronic boards), public address system equipment, entertainment fees, advertising fees, special public event personnel charges, security for public events (Landlord being under no obligation to provide security, however), traffic control for public events, sales promotions, access or license fees for adjacent properties, entertainment for the benefit of the general public visiting the Food Hub (collectively, "Promotional Activities" or "Promotional Costs"). Landlord shall have the sole right to determine the specific Promotional Activities and Promotional Costs of the Food Hub to be paid out of the Promotion Fund. Upon receipt of prior written notice from Landlord, Tenant agrees to contribute its Pro Rata Share of the Promotion Fund as Additional Rent (the "Promotion Fee"). Commencing from and after Landlord's written notice to Tenant, the Promotion Fee shall be paid to Landlord in equal monthly installments on the dates that monthly installments of Base Rent are due and payable hereunder or at such other times set forth in periodic billings from Landlord. In the event that Landlord incurs Promotional Costs in connection with the Promotional Activities, Landlord may deduct the Promotional Costs from the Promotion Fund to reimburse itself or to directly pay the providers of Promotional Activities. The Promotion Fee payable under this Section is subject to adjustment from time to time upon Landlord's reasonable discretion; provided, however, that from and after Landlord's first annual assessment of any Promotion Fee to Tenant, the Promotion Fee payable by Tenant in each subsequent Lease Year of the Term (or any Extended Term, if applicable) shall not exceed an amount equal to three and one-half percent (3.5%) of the Base Rent payable during the then-current Lease Year in question. Notwithstanding the foregoing, costs and expenses that are separately and completely reimbursable to Landlord by tenants as a result of provisions contained in their specific leases shall not be included in the Promotion Fund.

6.3    If Tenant at any time or from time to time shall fail to perform any of the covenants, terms and conditions in this Lease contained to be performed on the part of Tenant, which remains uncured beyond applicable notice and cure periods, Landlord may immediately, or at any time thereafter without notice, perform the same for the account of Tenant, and in any such event, any monies paid by Landlord for such purpose shall be deemed to be Additional Rent due hereunder and shall be payable forthwith to Landlord upon rendition of an invoice therefor. The foregoing remedy is in addition to any other remedies afforded to Landlord hereunder, including the remedy provided under Section 4.

6.4    Base Rent and Additional Rent, together with any and all other charges and sums required to be made by Tenant by the terms of this Lease, including, without limitation, any interest or late fees set forth in this Lease, are hereinafter collectively referred to as "Rent". Rent shall be payable beginning on the Rent Commencement Date in accordance with Section 5.1 above. Any Additional Rent accruing to the Landlord under this Lease, except as is otherwise specifically otherwise set forth herein, shall be due and payable when the installment of Base Rent next falling due after such Additional Rent accrues and becomes due and payable (e.g., the first (1st) day of each calendar month during such Lease Year).

7.    Permitted Uses; NMTC Prohibitions; Community Benefits; Employee Verification.

7.1    The Premises and the Patio License Area may be used by Tenant solely for the "Permitted Uses" set forth in the Lease Summary Schedule and for no other purpose or use without Landlord's prior written consent. Tenant shall, at its sole cost and expense, procure, maintain, and observe any and all licenses, permits, or other consents and approvals issued by any governmental authorities or permit granting or other agencies having jurisdiction over the Premises and the Patio License Area, the Building, the Land or the Permitted Use required by reason of any applicable statute, law, ordinance, rule or regulation

applicable to the Permitted Use of the Premises and the Patio License Area by Tenant (collectively, the "Permits"). Tenant at its sole cost shall provide copies of all Permits to Landlord.

7.2    Tenant shall not do or permit anything to be done in the Building or bring or keep anything therein which will in any way increase the rate of or conflict with any insurance on the Building or on property kept therein, or obstruct or interfere with other tenants or those doing business with them, or conflict with any of the statutes, rules or ordinances of the City of Providence, the State of Rhode Island or United States of America or of any of the departments or agencies of any of the foregoing authorities.

7.3    Landlord is a recipient of funding for the development and construction of the Food Hub from various federal, state and private sources (the "Source Loans"). The Source Loans require Landlord to provide the Source Loan lenders with assurances concerning use of the Source Loan funds and the various uses of the Food Hub, including without limitation, periodic updated employment reports from Landlord and all Tenants in order to monitor job compliance. As a condition of this Lease, at Lease execution, Tenant shall execute and deliver to Landlord the use restrictions set forth on the New Markets Tax Credit Disclosure and Acknowledgement attached hereto as Exhibit E (the "NMTC Restrictions"). Also, as a condition of this Lease, Tenant shall execute and deliver to Landlord upon not less than thirty (30) days' prior written request from Landlord the following: (i) the provisions of the Community Benefits Rider attached hereto as Exhibit F and (ii) the Employee Verification Form attached hereto as Exhibit G. Tenant shall at all times be in compliance with the NMTC Restrictions. Notwithstanding anything to the contrary contained herein, Tenant shall not be required to provide (or disclose) (i) employee names or (i) any other employee personally identifiable information that Tenant is not permitted to provide (or disclose) pursuant to state and/or federal law. Landlord shall insure that any information provided by Tenant to Landlord pursuant to this Section 7.3 and its related exhibits shall be kept confidential by Landlord and shall not be disclosed by Landlord, except when Landlord is required by state and/or federal law, rule, or regulation to disclose the same.

7.4    Tenant shall abide by and comply with rules and regulations promulgated by Landlord at any time or from time to time  which in the reasonable judgment of Landlord shall be necessary for the reputation, safety, care or appearance of the Building or the Food Hub, or the preservation of good order therein, or the operation or maintenance of the Building or the Food Hub, or the equipment thereof, or the comfort of tenants or others in the Building (the "Rules and Regulations"), provided, however, that in the case of any conflict between the provisions of this Lease and any such regulations, the provisions of this Lease shall control, and provided further that nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations or the terms, covenants or conditions in any other lease as against any other tenant and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, contractors, visitors, invitees or licensees.

8.    Landlord's Work.

8.1    As of the Lease Execution Date, Landlord's Work to the Premises has been Substantially Completed. Tenant acknowledges that Landlord and Landlord's agents and employees have made no representations or warranties with respect to the Premises or the physical condition thereof and none shall be implied in law, except for such express warranties which are stated in this Lease. "Substantially Completed" with respect to Landlord's Work shall mean that Landlord's Work has been completed except for only minor or insubstantial details of construction or mechanical adjustments which remain to be done in the Premises or any part thereof (e.g., so-called "punch-list" items). Landlord's architect's or contractor's certificate of substantial completion, given in good faith, or of any other facts pertinent to this Section 8.1, shall be deemed conclusive of the statements therein contained and binding upon Tenant. Tenant accepts the Patio License Area under its license in its "AS IS WHERE IS" condition.

9.    Tenant Improvements.

9.1    As of the Lease Execution Date, Landlord and Tenant have agreed upon plans and specifications (collectively, "Tenant's Plans") for the Tenant Improvements as well as the construction contract and payment terms for the Tenant Improvements, all as more particularly described in Exhibit D of this Lease.  Landlord agrees to cause its contractor (the "Contractor") to construct the Tenant Improvements pursuant to a separate contract between Landlord and such Contractor.

9.2    Landlord shall provide an allowance toward a portion of the total cost of the Tenant Improvements (excluding trade fixtures, equipment and inventory) within the Premises, in the amount and manner provided in Exhibit D. Tenant shall be solely responsible for the remaining cost of the Tenant Improvements and for any overruns, change orders and other expenses incurred in connection with the buildout of the Tenant Improvements for the Premises in excess of the Tenant Allowance.

9.3    The Tenant Improvements shall be deemed "Substantially Completed" on the earlier of that date upon which the City of Providence Department of Inspection and standards has issued a "certificate of occupancy" for the Premises (or a temporary certificate of occupancy or other legally sufficient equivalent document allowing occupancy of the Premises in light of the circumstances surrounding the COVID-19 crisis) or the date upon which Tenant takes occupancy of the Premises for the conduct of its Permitted Use. Notwithstanding anything to the contrary in this Section 9, if this Lease is terminated prior to the expiration of the initial Term as a result of Tenant's uncured default, Tenant shall pay to Landlord the unamortized portion of the Tenant Allowance, calculated on a straight line basis over the initial Term, commencing on the Rent Commencement Date and an annual interest rate of three percent (3.0%).

9.4    Immediately following Substantial Completion of the Tenant Improvements, Tenant may, at Tenant's sole cost and expense, commence and thereafter diligently pursue to completion, the installation in and equipping of the Premises with its personal property necessary or proper for the operation of the Permitted Use (collectively, the "Tenant Fixturing"). Tenant shall, at Tenant's sole cost and expense, obtain all permits and other governmental approvals (other than the certificate of occupancy) necessary for the Tenant Fixturing or Tenant's planned operation of the Premises. All Tenant Fixturing shall be performed in a good and workmanlike manner and in accordance with all applicable laws and in accordance with the terms of the Lease. Notwithstanding the foregoing, provided that Tenant and its employees, agents and contractors do not interfere with the performance of the work on the Tenant Improvements in the Premises, from and after the date that is thirty (30) days, or such earlier time as mutually agreed by the parties, prior to the estimated date of Substantial Completion of the Tenant Improvements work, Landlord shall allow Tenant access to the Premises to begin Tenant Fixturing.

10.    Hazardous Materials.

10.1    Tenant shall not permit the emission, release, threat of release or other escape of any Hazardous Materials (defined below) so as to adversely affect in any manner, even temporarily, any element or part of the Premises, the Patio License Area, or the Building. Tenant shall not use, generate, store or dispose of Hazardous Materials in or about the Building (except for ordinary office computer products, supplies and cleaning supplies which are stored, used and disposed of in compliance with all applicable Environmental Laws (defined below)), or dump, flush or in any way introduce Hazardous Materials (other than common cleaning products which are being disposed of in compliance with all applicable Environmental Laws) into sewage or other waste disposal systems serving the Building, nor shall Tenant permit its invitees, "Tenant Party") to take any of the foregoing actions.  This Lease is now or will be subject to an ELUR promulgated by the Rhode Island Department of Environmental Management with respect to the Building; Tenant shall not act in violation of any such ELUR (a copy of which shall be made available to Tenant upon request) with respect to the Building, the Land, the Common Areas or any adjacent property.

10.2     For purposes of this Lease, "Hazardous Materials" means, collectively, any animal wastes, medical waste, blood, bio-hazardous materials, hazardous waste, hazardous substances, pollutants or contaminants, petroleum or petroleum products, radioactive materials, oil (except for cooking oil to the extent used in connection with the Permitted Use and disposed of in compliance with all applicable laws, rules, orders and regulations), asbestos or lead in any form or condition, or any pollutant or contaminant or hazardous, dangerous or toxic chemicals, materials or substances within the meaning of any applicable federal, state or local law, regulation, ordinance or requirement relating to or imposing liability or standards of conduct concerning any such substances or materials on account of their biological, chemical, radioactive, hazardous or toxic nature, all as now in effect or hereafter from time to time enacted or amended. For purposes of this Lease, "Environmental Laws" means all laws, rules, orders and regulations of federal, state, county, and municipal authorities, concerning any Hazardous Materials whatsoever.

10.3     Tenant will indemnify, defend and hold Landlord harmless from and against all claims, loss, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements, costs incurred in connection with any investigation of site conditions or any clean-up or remedial work required by any federal, state or local governmental agency) to the extent incurred as a result of any contamination (or, in the case of investigations and testing, any reasonably suspected contamination) of the Premises, the Patio License Area, or any other portion of the Building with, or any release of, Hazardous Materials caused or permitted by (or, in the case of investigations and testing, reasonably suspected to have been caused or permitted by) Tenant or any Tenant Party.  Without limiting the foregoing, if the presence of any Hazardous Materials in, on or under the Premises, the Patio License Area, or any other portion of the Building caused or permitted by (or, in the case of investigations and testing, reasonably suspected to have been caused or permitted by) any Tenant Party results in (or, in the case of investigations and testing, is reasonably suspected to have resulted in) any contamination of the Premises, the Patio License Area or any other portion of the Building, the Land or any other property, Tenant shall promptly take all actions at its sole expense as are necessary to investigate and test the affected (or reasonably suspected to have been affected) area, and if any contamination is found, then to return the Premises, the Patio License Area, the Building, the Land and such other property to the condition existing prior to the introduction of any such Hazardous Material by any Tenant Party, provided that Landlord's approval of such action shall first be obtained, which approval shall not be unreasonably withheld so long as such actions would not potentially have any material adverse long-term or short-term effect on Landlord, the Premises, the Patio License Area, the Building or the Land. The obligations of Tenant and Landlord in this Section shall survive the expiration or earlier termination of this Lease and any transfer of title to the Premises, the Patio License Area, whether by sale, foreclosure, deed in lieu of foreclosure or otherwise. Landlord agrees to indemnify, defend and hold Tenant harmless from and with respect to any Hazardous Materials in the Premises, the Patio License Area, or Building released by Landlord.

11.     Maintenance and Repair; Alterations.

11.1     During the Term (and any Extended Term, if applicable), Landlord shall maintain in good condition and repair (and replace as necessary) the roof, floor slab, utility and plumbing services to the point of entry of the Premises, and the remainder of the Building and Common Areas and all structural and mechanical components thereof not comprising the Premises.  Landlord shall maintain and keep clean all Common Areas, remove snow and trash therefrom when reasonably required, and provide adequate lighting for all Common Areas, including the parking areas. Notwithstanding the foregoing, Landlord shall not be required to make any improvements, replacements or repairs of any kind with respect to the Premises and appurtenance thereto unless the same is necessitated by the negligence or willful misconduct of Landlord or any Landlord Party. Tenant shall pay to Landlord the cost of any repairs and replacements to any portion of the Premises or Building or other improvements or appurtenances thereto necessitated by reason of any act or omission, negligence or misconduct of Tenant, or any Tenant Party, or the operations of Tenant or the storage of Tenant's merchandise within the Premises.

11.2    Except for repairs required to be made by Landlord pursuant to Section 11.1 hereof, Tenant, at its expense, shall maintain and make all repairs and/or replacements to the Premises and all of the following items in the Premises (regardless of which party is deemed to own the same) as necessary to keep them in the same condition as they are in as of the Term Commencement Date, reasonable wear and damage by fire or other casualty excepted: all Tenant Improvements; all Tenant Fixturing; all equipment; all systems (including heating and heat pumps, ventilation, air conditioning (including oiling, filter changes, belt repair and/or replacements, refills of freezing compound to the air conditioning, required compliance with any environmental laws, rules, regulations, ordinances with respect to such systems); all electrical (including lights, lightbulbs and plugs), all gas lines (if applicable), all plumbing and sewer lines, including all grease traps serving the Premises; all cables, ducts, vents, hoods and exhaust systems (if applicable); the exterior and interior portions of all doors in the Premises including door checks and hardware; all windows including hardware and other appurtenances in the Premises (Tenant shall promptly replace all broken or cracked glass); and the ceiling of the Premises.  All items that Tenant shall replace shall be new and be of equal or better quality, specifications, type and style than the item being replaced. Tenant will maintain and keep in good condition and repair the storefront (if applicable) and all structural and exterior work done or installed by Tenant. Tenant shall not permit any waste, damage or injury to the Premises, the Patio License Area or any portion thereof. Without limiting the foregoing, Tenant shall be obligated to keep the Premises free of trash, refuse and pests. Tenant shall keep any garbage, trash, rubbish or other refuse in containers within the interior of the Premises until removal by Tenant to such location outside the Building as agreed by Landlord and Tenant. Tenant shall contract with its own licensed pest extermination service to prevent the presence of rodents, insects and similar pests, covering the Premises and the Patio License Area as needed. Landlord shall have the right to approve such licensed pest extermination service. Tenant shall not injure or deface the Premises the Patio License Area or any other part of the Building, nor suffer any waste thereof, nor without Landlord's consent, which consent shall not be unreasonably withheld, make any alterations and improvements in the Premises, the Patio License Area or the Building. As a condition to granting such consent, Landlord and Tenant shall mutually agree on whether Tenant shall be required, upon the expiration or termination of this Lease, at its own expense, to restore any part of the Premises altered by Tenant to its condition prior to such alternation. Tenant shall not make or permit any installations through, to or on the roof, ceiling, or any portions of the Building above or below the Premises without first obtaining Landlord's prior written consent to the work to be done and the contractor to perform such work; and Landlord shall have the right to require Tenant to use Landlord's roofing contractor in connection with any work affecting the roof of the Premises.

12.    Surrender. On the last day of the Term (or the Extended Term, if applicable), or other earlier termination of this Lease, Tenant, at its expense shall (a) promptly surrender to Landlord possession of the Premises and the Patio License Area (including any fixtures or other improvements which are owned by Landlord) in good order and repair (ordinary wear and tear excepted) and broom clean, (b) remove therefrom all signs, goods, effects, machinery, fixtures and equipment used in conducting Tenant's trade or business which are neither part of the Building Service Equipment (hereinafter defined) nor owned by Landlord, and (c) repair any damage caused by such removal.  In the event that Tenant shall fail to surrender the Premises or the Patio License Area to Landlord at the end of the Term (or the Extended Term, if applicable), then Tenant shall be a tenant at sufferance. During any such holding over by Tenant, Base Rent shall be calculated at two (2) times the Base Rent and Additional Rent then in effect. "Building Service Equipment" means all apparatus, machinery, devices, fixtures, appurtenances, equipment and personal property now or hereafter located in or servicing the Premises and owned by Landlord.

13.    Services and Utilities. Landlord shall not be liable for any interruption or alteration in provision of any services, Utilities or commodities, nor for any damages resulting from defects in the provision of same so long as any such interruption or alteration is not the result of the negligence or willful misconduct of Landlord.

14

14.     Property at Risk of Tenant. All property of any kind that may at any time be in or about the Premises or the Patio License Area shall be at the sole risk of Tenant and Landlord shall not be liable for any injury, loss, theft or damage of or to any such property, except for injury, loss, theft or damage of or to any such property arising out of acts, negligence or default of Landlord or its agents, employees or independent contractors.

15.     Waiver of Claims, Indemnity and Insurance.

15.1    Landlord agrees to indemnify and save harmless Tenant from and against any and all liabilities, losses, damages, costs, expenses, causes of action, suits, claims, demands or judgments of any nature arising from injury to or death of any person, or damage to or loss of property, in the Premises or the Building arising from  negligence or willful misconduct of Landlord and/or Landlord's agents, servants, employees  except to the extent the same is in any part due to negligence or acts on the part of Tenant or any Tenant Party.  This indemnity and hold harmless agreement shall include indemnity against all costs, including reasonable attorney's fees, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon.

15.2    Tenant agrees to indemnify and save harmless Landlord from and against any and all liabilities, losses, damages, costs, expenses, causes of action, suits, claims, demands or judgments of any nature arising from (i) injury to or death of any person, or damage to or loss of property, in the Premises and/or connected with the use, condition or occupancy of the Premises and the Patio License Area, or in the Building or Common Areas, except to the extent caused by the negligence or willful misconduct of Landlord and/or Landlord's agents, (ii) any uncured violation by Tenant of this Lease, and (iii) any act, fault, omission, or other misconduct of Tenant or any Tenant Party.  This indemnity and hold harmless agreement shall include indemnity against all costs, including reasonable attorney's fees, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon.

15.3    Tenant agrees to maintain in full force during the Term (and the Extended Term, if applicable) at Tenant's sole cost and expense, insurance policies written by insurance companies authorized to do business in the State of Rhode Island and reasonably approved by Landlord of the types and in amounts not less than as specifically set forth below.  Landlord shall be named as an additional insured on such insurance policies and upon Landlord's request, Tenant shall cause such insurance policies to name the holders of any mortgage encumbering the Food Hub Property as additional insureds. Each such policy shall provide that such policy will not be cancelled without thirty (30) days' prior written notice to Landlord, and a duplicate original or certificate thereof as well as satisfactory evidence of the payment of all premiums shall be delivered to Landlord upon the Lease Execution Date and thereafter annually during the Term no less than fifteen (15) days prior to the expiration date of each expiring policy evidencing the policies of insurance required hereunder, which shall include:

(i)     Commercial General Liability Insurance insuring Tenant on an occurrence and per location basis against all claims and demands for personal injury liability (including, without limitation, bodily injury, sickness, disease, and death) or damage to property which may be claimed to have occurred from and after the time Tenant and/or its contractors enter the Premises or the Patio License Area in accordance this Lease, subject to commercially customary exclusions and limitations, of not less than One Million ($1,000,000) Dollars per occurrence and Two Million ($2,000,000) Dollars in the aggregate in the event of personal injury to any number of persons or damage to property, arising out of any one occurrence, and from time to time thereafter shall be not less than such higher amounts, if procurable, as may be reasonably required by Landlord and are customarily carried by responsible similar tenants in the City of Providence.  Landlord reserves the right to approve such lesser amounts on a per-tenant lease basis depending on the specific permitted use to be conducted at any particular leased premises. Notwithstanding the foregoing, Tenant shall

be solely responsible for any costs incurred by Landlord due to an increase in Landlord's policy of public liability and/or property damage insurance resulting from Tenant's use of the Premises.

(ii)    "All Risk" property insurance at full replacement cost value insuring only Tenant on Tenant's personal property, including inventory, trade fixtures, wall and floor coverings, furniture and other personal property removable by Tenant and leasehold improvements either existing within the Premises or the Patio License Area at the Term Commencement Date or installed by Tenant during the Term of this Lease.

(iii)    If applicable as determined by Landlord in its reasonable discretion, liquor liability insurance for injury to persons and property in a sum not less than One Million ($1,000,000) Dollars per each occurrence, or such higher sum as Landlord may require in the future, naming Landlord and the holder of any mortgage encumbering the Food Hub Property as additional and co-insured. A certificate of such insurance, evidencing such liquor liability insurance coverage, as required herein, shall be provided to Landlord prior the service or consumption of alcoholic beverages on the Premises and on the Patio License Area and thereafter annually as provided above.

(iv)    Promptly after Landlord's reasonable request therefor, business interruption insurance in a sum not less than the then current yearly Base Rent, or such higher sum as Landlord may require in the future, but in no event shall the business interruption insurance be less than the Base Rent payable by Tenant annually. Such insurance shall name Landlord as assignee of the proceeds of such policy.

(v)    Worker's compensation insurance as required by applicable law.

15.4    Landlord shall maintain, throughout the Term (and the Extended Term, if applicable), policies of insurance covering damage to the Food Hub Property and/or the Building, excluding Tenant's fixtures, or equipment, in the amount of the full replacement value thereof, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, "all risk" and fire sprinkler leakage insurance. Landlord shall at all times during the Term (and the Extended Term, if applicable), keep in force a policy or policies of commercial general liability insurance, which may be through an endorsement on a blanket liability insurance policy such amounts as Landlord and/or Landlord's mortgagee(s) shall deem reasonably necessary and appropriate from time to time. Landlord's insurance shall name Tenant as an additional insured against any and all damages and liability on account of or arising out of injuries to or the death of persons, or for property damage, occurring in the Common Areas and not caused by the negligence or misconduct of Tenant or any Tenant Party. The cost associated with the aforementioned insurance to be carried by Landlord shall be deemed included in Base Rent.

16.    Assignment and Subletting. Tenant shall not without Landlord's prior written consent (i) encumber, sell, assign or transfer this Lease, in whole or in part, (ii) permit any assignment of this Lease by operation of law, (iii) sublet or sublicense the Premises, the Patio License Area or any portion thereof or any of Tenant's appurtenant rights hereunder (including without limitation any Special Access rights, Common Areas or usage of vendor tables), or (iv) permit the use or occupancy of all or any part of the Premises or the Patio License Area or any of Tenant's appurtenant rights hereunder (including without limitation any Special Access rights, Common Areas or usage of vendor tables) by any parties other than Tenant, its agents and employees. Any request by Tenant for such consent shall include the name of the proposed Transferee, the nature of its business and proposed use of the Premises (and if, applicable, but subject to Landlord's approval, the Patio License Area), complete information as to its financial condition, and the terms and conditions of the proposed Transfer. Tenant shall supply such additional information about the proposed Transfer and Transferee as the Landlord reasonably requests. Tenant shall reimburse Landlord for its legal and other expenses in connection with any request for consent. In any case where Landlord shall consent to an assignment or subletting, Tenant shall remain primarily liable for Tenant's obligations hereunder,

jointly and severally with any permitted assignee or sublessee, until the end of the Term (and the Extended Term, if applicable). The transfer of a majority interest in the capital stock of any corporate Tenant or a majority of the interest in any partnership Tenant, however accomplished, and whether in a single transaction or in a series of related or unrelated transactions, shall be deemed an assignment of this Lease. If for any approved assignment or sublease Tenant receives Rent or other consideration, either initially or over the term of the assignment or sublease, in excess of the Rent called for hereunder, or in case of a sublease of part of the Premises, in excess of the portion of such Rent fairly allocable to such part, after appropriate adjustments to assure that all other payments called for hereunder are appropriately taken into account, to pay to Landlord as Additional Rent the full excess of each such payment of Rent or other consideration received by Tenant promptly after its receipt. Any assignment, subletting or transfer of this Lease which is not in compliance with the provisions of this Section shall be of no effect and void. Without limitation of the rights of Landlord hereunder in respect thereto, if there is any assignment of this Lease by Tenant for consideration or a subletting of the whole of the Premises by Tenant at a rent which exceeds the rent payable hereunder by Tenant, or if there is a subletting of a portion of the Premises by Tenant at a rent in excess of the subleased portion's pro rata share of the rent payable hereunder by Tenant, then Tenant shall pay to Landlord, as additional rent, forthwith upon Tenant's receipt of the consideration (or the cash equivalent thereof) therefor, in the case of an assignment, and in the case of a subletting, the full amount of any such excess rent. The provisions of this Section shall apply to each and every assignment of the Lease and each and every subletting of all or a portion of the Premises, whether to a subsidiary or controlling corporation of the Tenant or any other person, firm or entity, in each case on the terms and conditions set forth herein. For the purposes of this Section, the term "rent" shall mean all Base Rent, additional rent or other payments and/or consideration payable by one party to another for the use and occupancy of all or a portion of the Premises. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have no right to assign or sublicense all or any portion of the Patio License Area without Landlord's prior written consent.

17.    Quiet Enjoyment. So long as Tenant fully abides by and performs the covenants and conditions hereof, Tenant may peacefully hold and enjoy the Premises for the Term (and the Extended Term, if applicable), subject to the terms and conditions of this Lease.

18.    Entry.

18.1    Landlord, its agents, or employees, shall have the right to enter the Premises and the Patio License Area at reasonable times (and upon reasonable prior notice to Tenant, telephonic notice being acceptable except that no notice shall be required in emergency situations) to examine the same, to make repairs or alterations to any part of the Building as Landlord shall deem necessary or to enforce any of the Rules and Regulations, to give any notice required or permitted to be given to Tenant hereunder, to exhibit the Premises to prospective brokers, lenders, agents, buyers and to post "For Sale" or "For Lease" signs during the last six (6) months of the Term or during any period while Tenant is in default.

18.2    If Tenant shall not be personally present to open and permit entry into the Premises and/or the Patio License Area at any time during an emergency when for any reason an entry therein shall be deemed reasonable by Landlord due to an emergency, Landlord or Landlord's agents may enter the Premises by a master key or (if Landlord cannot locate or does not have reasonable access to its master key) may forcibly enter the same giving reasonable care to Tenant's property, without rendering Landlord or such agents liable therefor, and without in any manner affecting the obligations and covenants of this Lease. Provided that Landlord shall incur no additional expense thereby, Landlord shall exercise its rights of access to the Premises permitted under any of the terms and provisions of this Lease in such manner as to minimize, to the extent practicable, interference with Tenant's use and occupation of the Premises.

19.    Eminent Domain and Damage.

19.1    Landlord and Tenant further covenant and agree that in case the whole or any part of the Building is destroyed or damaged by fire or other casualty, or is damaged, condemned or taken by public authority so as to render the same unfit for use or occupancy, and whether or not the Premises are affected thereby (hereinafter sometimes "damage event"), Landlord may, if it shall be unable to or shall elect not to repair or restore the Premises and/or the Building, terminate this Lease upon not less than thirty (30) days' notice given to Tenant within sixty (60) days after the damage event, notwithstanding Landlord's entire interest may have been divested; provided that if the Premises are rendered wholly or partly untenantable by the damage event, and if such damage shall not have been caused by the neglect, default or misuse thereof by Tenant, a just abatement of the Rent shall be made until the Premises shall be restored to tenantable condition or until such termination of this Lease.

19.2    In the event that the Premises are destroyed or damaged by fire or other casualty or are damaged, condemned or taken by public authority so as to render the same unfit for use or occupancy, and such damage shall not have been caused by the neglect, default or misuse thereof by of Tenant, and Landlord shall be unable to render the Premises fit for use or occupancy within sixty (60) days of the condemnation or damage, Tenant may terminate this lease by written notice to Landlord not less than sixty (60) days nor more than one hundred twenty (120) days following such damage event and upon the giving of such notice this Lease shall be terminated.  In the event of any such action by public authority, Tenant shall have no right, title or interest in any award or proceeds hereof and Tenant hereby assigns all rights to awards to Landlord; provided, however, that Tenant may make a claim for loss of Tenant's fixtures and business and relocation expenses which have been specifically provided for in the award for condemnation damages.

20.   Defaults and Remedies.

20.1   If Tenant shall:

(i)      Fail to pay any installment of Base Rent, Additional Rent or any of the other payments at the times and in the manner provided for herein, such failure having continued for a period in excess of ten (10) days after the same becomes due and payable;

(ii)      Fail to perform or comply with any of the other conditions or agreements expressed or implied herein and fail to remedy such lack of compliance within thirty (30) days after notice from Landlord of such failure;

(iii)      Vacate or close the Premises for sixty (60) consecutive days whether or not the result of any act, occurrence or circumstance beyond Tenant's control; or

(iv)      Liquidate or cease to exist, seek relief under any law for the relief of debtors, make an assignment for the benefit of creditors or be the subject of a voluntary or involuntary petition in bankruptcy or receivership which shall remain undismissed or unstayed for an aggregate of sixty (60) days, or if any debtor in possession (whether or not Tenant), receiver or liquidator of Tenant or of all or any substantial part of Tenant's properties or of the Premises shall be appointed without the consent or acquiescence of Tenant and such appointment shall remain undismissed or unstayed for an aggregate of sixty (60) days, or if the estate hereby created shall be levied upon or taken by execution or process of law.

20.2      Then and in any of such cases regardless of any waiver or consent of any earlier event of default, Landlord, at its option, may exercise any and all remedies available to Landlord under law, including without limitation the following:

(i)      Landlord may terminate this Lease.

(ii)      In addition to any other remedies available at law, equity, or under this Lease, Tenant covenants that it will pay to Landlord upon demand and indemnify Landlord from and against any loss and expense directly sustained by reason of any default and/or termination resulting therefrom, including without limitation, any loss of rent prior to or after reletting the Premises, broker's commissions, costs of advertising, preparing the Premises for reletting, any moving, storage and disposition of Tenant's property, court costs and reasonable attorney's fees.

(iii)      After a default by Tenant, Landlord (a) may remedy such default at Tenant's expense without waiving such default and/or (b) may re-lease all or any portion of the Premises for any term and use. Following default and a termination of this Lease, Landlord agrees to use commercially reasonable efforts to re-lease the Premises.

(iv)      This Lease and the estate created hereby shall not continue or inure to the benefit of any assignee, receiver or trustee in bankruptcy of Tenant except at the option of Landlord.

Except as may be expressly and specifically set forth herein to the contrary, any and all remedies set forth in this Lease: (a) shall be in addition to any and all other remedies Landlord may have at law or in equity; (b) shall be cumulative; and (c) may be pursued successively or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

20.3    All sums due to Landlord from Tenant under this Lease which are not paid when due (due dates shall be extended by any periods of grace granted under this Lease for this purpose), whether or not a default hereunder has occurred or been declared by Landlord, shall bear interest at the rate of 1½% per month until paid in full, payable to Landlord on demand.

21.    Waiver and Consent. Waiver or consent by either party of or to any default or breach of any of the terms, conditions or covenants hereof or of any other tenant's lease in any instance shall not be deemed to be a waiver of or consent to any later breach or default thereof or to any other default under any other term, condition, or covenant hereof.  A receipt by Landlord of Rent, Additional Rent or any other sum from Tenant with knowledge of any breach or default shall not be deemed to be a waiver or consent thereto unless expressly acknowledged in writing by Landlord. For purposes of this Lease "Landlord's consent" shall mean the prior written consent of Landlord in each instance.

22.    Signs. Landlord shall provide design, fabrication and installation of initial signage to the Premises as mutually agreed by Landlord and Tenant but otherwise consistent with building standards set by Landlord (the "Building Standard Signs"). Tenant will not otherwise place or suffer to be placed or maintained on the exterior of the Premises or the Patio License Area or anywhere within the Building any signs, advertising matter or any other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's written approval thereof.  Tenant shall prepare and submit to Landlord for its approval plans for all interior and exterior signage for the Premises and the Patio License Area to the extent that additional signage is desired beyond the Building Standard Signs. Once approved by Landlord in writing and after Tenant has obtained any and all necessary governmental approvals, Tenant may purchase and install such signage. Tenant agrees to maintain its Building Standard Signs, any sign, decoration, lettering, advertising matter or other items approved by Landlord in good condition and repair (including replacement) at all times.

23.    Loading; Parking. All loading and unloading and all deliveries of any kind shall be done only at such times and at such locations and through such entrances as shall be designated by Landlord for such purposes. To the extent on-site parking is provided by Landlord, Tenant shall be entitled to the use of the parking spaces available during Landlord's normal business hours on a first come, first served basis in common with others entitled to use of same; provided, however, that Landlord reserves the right to reserve any or all on-site parking for any Landlord Parties and/or Food Hub Parties and/or to designate employee and vendor parking requirements in the Rules and Regulations.  Notwithstanding anything to the contrary contained herein, Landlord hereby grants Tenant Special Access Rights in the form of a non-exclusive license to utilize Monday through Friday  on a twenty-four (24) hour basis, up to three (3) single parking spaces at the Property in such locations designated by Landlord from time to time, for Tenant's delivery vehicles (the dimensions of each of which shall not exceed the dimensions of any single parking space provided on the Property ) for the purpose of making deliveries from Tenant's commissary located at the Premises and other food establishments owned and operated by Tenant and its affiliates (the "Delivery Vehicle Parking Spaces").Tenant's use of the Delivery Vehicle Spaces shall at all times comply with the Rules and Regulations.  Landlord shall use commercially reasonable efforts to work with the City of Providence to secure short-term, curbside parking for co-locator customers along Sims Avenue before summer 2021.

24.    Broker's Commissions. Landlord and Tenant each represents that it has not dealt with any real estate agent or broker in connection with the negotiation of this Lease or the leasing of the Premises and agrees to hold the other party harmless from all loss, cost or expense resulting from the breach by such party of this representation.

25.    Entire Agreement. This document shall become effective and binding only upon the execution and delivery hereof by both Landlord and Tenant. This Lease sets forth all covenants, agreements and

understandings between Landlord and Tenant concerning the Premises and the renting thereof and Landlord has made no representations or promises with respect to the Building or the Premises except those contained herein. Except as otherwise provided herein, no amendment or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by both parties hereto.

26.    Notices. Any notice required or permitted to be given by one party hereto to the other party hereto shall be deemed to have been duly given when delivered or served personally and (i) given by certified mail, return receipt requested, in the United States mail, or (ii) delivered by any commercially recognized courier service which obtains a written receipt or (iii) delivered by any overnight delivery service such as Federal Express, and shall be delivered to the Notice Address set forth in the Lease Summary Schedule attached hereto or to such other addresses of which either party, as the case may be, shall notify the other in the manner herein stated for giving notice and such delivery shall constitute the giving of such notice hereunder.

27.    Underlying Leasehold Interests. The Lease is a sub-sublease, subject to the terms and conditions of (i) a ground lease entitled "Lease" between FF Realty Corporation, a Rhode Island nonprofit corporation ("FF Realty"), as tenant, and the Providence Redevelopment Agency, as landlord, dated as of September 19, 2019, a memorandum of which is recorded in the City of Providence Land Evidence Records at Book 12487, Page 4 (the "Ground Lease"), and (ii) a master sublease entitled "Sublease Agreement" between Landlord, as tenant, and FF Realty, as landlord, dated as of September 19, 2019, a memorandum of which is recorded in the City of Providence Land Evidence Records at Book 12487, Page 124 (the "Sublease").

28.    Subordination and Nondisturbance. This Lease and all rights of Tenant hereunder are and shall remain subject and subordinate to the Ground Lease, the Sublease and any mortgages which may now or hereafter affect the Premises, the Building or the Land and to all renewals, modifications, consolidations, replacements and extensions thereof. Such subordination shall be automatic without the execution of any further subordination agreement by Tenant; provided, however, that if a written subordination agreement is required by any mortgagee, Tenant hereby agrees to execute same and in the event of Tenant's failure to do so, Tenant hereby irrevocably constitutes Landlord its attorney-in-fact, for such purpose. In the event that any party shall succeed to Landlord's interest, this Lease shall continue in effect and Tenant shall attorn to such party without delay, provided that Tenant's use and enjoyment of the Premises are not disturbed. If requested by Tenant in writing, Landlord shall use commercially reasonable efforts to obtain a so-called "Subordination, Nondisturbance and Attornment Agreement" from any mortgage holder of Landlord's interest in the Food Hub.

29.    Notice to Mortgagee. Upon receipt of a written request by Landlord or any holder of a mortgage on all or any part of the Premises, Tenant will thereafter send any such holder copies of all notices of default or termination or both given by Tenant to Landlord in accordance with any provision of this Lease. In the event of any failure by Landlord to perform, fulfill or observe any agreement by Landlord herein or any breach by Landlord of any representation or warranty of Landlord herein, any such holder may at its election cure such failure or breach for and on behalf of Landlord. The foregoing sentence shall not be deemed to create any obligation for such holder(s).

30.    Estoppel Certificate. Tenant will from time to time, upon not less than ten (10) days' prior written request by Landlord, deliver to Landlord or any actual or prospective purchaser or holder of a mortgage on all or any part of the Premises, a written statement certifying whether or not this Lease is in full force and effect and stating (i) the last date to which the Rent and other payments have been made, (ii) whether or not this Lease has been amended, (iii) whether or not to Tenant's knowledge Landlord is in default in the performance, fulfillment or observance of any representation, warranty or agreement by Landlord set forth herein, or has any indebtedness to Tenant for the payment of money, and (iv) if so, the nature of each such default or indebtedness. Such statement shall also provide such other information as Landlord may reasonably request.

31.    Collateral Assignment of Lease. With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rentals payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage on Landlord's estate, Tenant agrees:

      (i)    that the execution thereof by Landlord and the acceptance thereof by the holder of such mortgage, shall not be deemed an assumption by such holder of any of the obligations of Landlord hereunder, unless such holder shall, by written notice sent to Tenant, specifically otherwise elect; and

      (ii)   that, except as aforesaid, such holder shall be treated as having assumed Landlord's obligations hereunder only upon foreclosure of such holder's mortgage and the taking of possession of the Premises.

32.    Landlord While an Owner. As used herein "Landlord" shall mean the owner for the time being of Landlord's estate and property in the Premises and if such estate and property be sold or transferred, the seller or transferor shall thereupon be relieved of all obligations and liabilities hereunder thereafter arising or occurring, and the purchaser or transferee shall thereupon be deemed to have assumed and agreed to perform and observe all obligations and liabilities hereunder thereafter arising or occurring, or based on occurrences or situations thereafter arising or occurring.

33.    Successors, Assigns, Joint and Several. The words "Landlord" and "Tenant" shall include their respective heirs, legal representatives, successors and assigns. If more than one party signs as Tenant hereunder the covenants, conditions and agreements herein of Tenant shall be the joint and several obligations of each such party. In like manner, if Tenant named in this Lease shall be a partnership or other business association, the members of which are, by virtue of statute or general law, subject to personal liability, the liability of each such member shall be joint and several.

34.    Governing Law. This lease shall be governed by the laws of the State of Rhode Island without reference to its conflict of laws provisions.

35.    Landlord's Liability. Any liability of Landlord (and its partners, shareholders or members) to Tenant for a default under the terms of this Lease shall be recoverable only from the interest of Landlord in the Building, and the rents, proceeds of sale, and any insurance proceeds available to Landlord. In no event shall Landlord (or its partners, officers, shareholders or members) have any personal liability for any default. Tenant shall have no right to terminate this Lease for any default by Landlord hereunder and no right, for any such default, to offset or counterclaim against any Rent due hereunder. Landlord shall have no liability for any incidental or consequential damages of Tenant, or anyone claiming by, through, or under Tenant, for any reason whatsoever. Landlord shall not be liable for any damages other than actual and direct damages. This Section shall not limit any equitable remedies.

36.    Independent Covenants. As a material inducement for Landlord and Tenant to enter into this Lease, both Landlord and Tenant acknowledge and agree that this Lease shall be construed as though the covenants herein between Landlord and Tenant are completely independent and not dependent and Tenant hereby expressly waives the benefit of any currently existing or hereinafter enacted statute or case law to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord or terminate this Lease as a result of Landlord's failure to perform or refraining from performing any covenant or obligation of Landlord hereunder.

37.    Severability. If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such

clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and still be legal, valid, and enforceable.

38.     Recording of Lease. Landlord and Tenant agree not to record or to cause this Lease or any memorandum or notice to be recorded in any public office including, by way of example but not limitation, the records of land evidence in the municipality within which the Building is located. In the event that Tenant records or causes this Lease or any memorandum or notice to be recorded as set forth above, Tenant shall be in default hereunder and Landlord shall have all rights and remedies available as a result of a default hereunder.

39.     Lease Guaranty. In connection with and as a condition to Landlord's obligations under this Lease, Tenant shall deliver to Landlord a Lease Guaranty in the form attached hereto as Exhibit H executed by the therein named guarantors (the "Guaranty"). Provided that as of March 1, 2024 (the "Third Anniversary") Tenant is not then in default of the Lease beyond the expiration of any applicable grace period, Tenant shall notify Landlord of the same and, if Tenant is in fact not in default of the Lease beyond the expiration of any applicable grace period, Landlord shall confirm the same in writing within fifteen (15) days of Tenant's notice and the Guaranty shall automatically terminate effective as of the Third Anniversary without any further action by the parties and the Guaranty shall be void and of no further force effective as of such Third Anniversary.

40.     Jury Trial Waiver. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY, AND IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY AND AGREE THAT ANY CLAIM, COUNTERCLAIM, AND OTHER DISPUTE HEREUNDER SHALL BE DECIDED SOLELY BY A JUDGE (WITHOUT THE USE OF A JURY) SITTING IN A COURT OF COMPETENT JURISDICTION. THIS JURY TRIAL WAIVER PROVISION SHALL SURVIVE THE TERMINATION OF THIS LEASE.

41.     Landlord's Right of First Refusal. If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment, setting forth (i) the name and address of such person, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such person's future performance under the Lease, including, without limitation, the assurance referred to in section 365(b)(3) of the Bankruptcy Code, shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less the then unamortized cost of the Tenant Allowance and less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

42.     Exclusive Use. During the Term, Landlord shall not lease any space in the Building to a tenant whose primary business is operation of a Mexican, Chicano, and/or Tex Mex restaurant (i.e., tacos, burritos, burrito bowls, tortas, nachos, quesadillas, churros, and/or other similar food items comprise 30% or more of the tenant's overall food menu). Landlord shall allow Tenant, in its sole direction, to participate in all Mexican, Chicano, and/or Tex Mex themed events at the Food Hub. Landlord agrees that any uncured breach of this Section 42 shall cause Tenant substantial and irreparable damages and therefore, in the event of any such uncured breach, in addition to other remedies which may be available, if Landlord shall fail to cure any breach in accordance with Section 43 of this Lease, Tenant shall be entitled to seek specific performance and other injunctive and equitable relief. Notwithstanding the foregoing, Tenant shall not

directly or indirectly, make any demand, claim or actions against any tenants or occupants of the Food Hub based on this Section 42.

43.    Landlord Default.  Landlord shall in no event be in default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days after notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation.  Under no circumstances shall Tenant be entitled to set off against the rental herein reserved or other payment herein required to be made by it any amounts which might be due to it by Landlord.

44.    Counterparts; Electronic Signatures.  This Lease may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same agreement. The parties shall be entitled to sign and transmit an electronic signature of this Lease (whether by facsimile, PDF or other e-mail transmission), which signature shall be binding on the party whose name is contained therein.  Any party providing an electronic signature agrees to promptly execute and deliver to the other parties an original signed Lease promptly upon the recipient's request.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed as of the day and year first set forth above.

**TENANT:**

TALLULAH'S TAQUERIA, LLC

By: _____
Print Name: Kelly Ann Rojas
Title: Authorized Member


**LANDLORD:**

FARM FRESH RHODE ISLAND,
a Rhode Island nonprofit corporation


By: _____
Print Name: _____
Title: _____

25

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed as of the day and year first set forth above.

**TENANT:**

TALLULAH'S TAQUERIA, LLC

By: _____
Print Name: Kelly Ann Rojas
Title: Authorized Member

**LANDLORD:**

FARM FRESH RHODE ISLAND,
a Rhode Island nonprofit corporation

By: _____
Print Name: Sheri Griffin
Title: Co-Executive Director

25

**EXHIBITS TO LEASE AGREEMENT OMITTED FOR BREVITY**